UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

TRACY BOONE,

                          Plaintiff,                    Case No. 1:20-cv-389

v.                                                      Honorable Janet T. Neff

K. NEMESITO et al.,

                          Defendants.
_____/

## OPINION

          This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983.

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the

Court is required to dismiss any prisoner action brought under federal law if the complaint is

frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary

relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C.

§ 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*,

404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly

irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these

standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.        Factual allegations

          Plaintiff is presently incarcerated with the Michigan Department of Corrections

(MDOC) at the Oaks Correctional Facility (ECF) in Manistee County, Michigan.  Plaintiff is

serving a string of consecutive sentences.  On September 19, 1988, Plaintiff entered a guilty plea

to a drug offense, and the Wayne County Circuit Court sentenced Plaintiff to 1 to 20 years' imprisonment.  Plaintiff was apparently released on parole and, during his release, he committed another drug offense.  He again pleaded guilty.  The Wayne County Circuit Court imposed a sentence of 2 to 5 years, to be served consecutively to the sentence for which he was on parole at the time he committed the second offense.

During 1997, while Plaintiff was serving his sentences for the drug offenses in the Marquette Branch Prison (MBP), Plaintiff was charged with assaulting another prisoner.  He entered a guilty plea in the Marquette County Circuit Court.  The court sentenced Plaintiff to 1 to 4 years' imprisonment, to be served consecutively to his other sentences.  Then, during 2011, while Plaintiff was serving his sentences at the Baraga Correctional Facility (AMF), Plaintiff was charged with assault of a prison employee.  Plaintiff entered a plea of *nolo contendere*.  The court sentenced Plaintiff to 2 years, 6 months to 5 years' imprisonment, to be served consecutively to his other sentences.  Plaintiff has spent most of the last 32 years in prison.  His earliest release date passed six years ago.  He has less than 17 months remaining until his maximum discharge date.

Plaintiff contends that during the late 1990s, he was designated as a Security Threat Group (STG) member.  An STG is defined under MDOC Policy as "a group of prisoners designated by the Director as possessing common characteristics which distinguish them from other prisoners or groups of prisoners and which, as an entity, pose a threat to staff or other prisoners or to the custody, safety and security of the facility."  Mich. Dep't of Corr. Policy Directive (PD) 04.04.113(B) (eff. Feb. 26, 2015).  The policy provides for a Correctional Facilities Administration (CFA) manager who coordinates STG tracking and monitoring for the entire MDOC; in addition, the warden of each facility appoints a local STG coordinator for the institution.  PD 04.04.113(H-I).

A prisoner may be designated an STG I by the local STG Coordinator if there is sufficient documentation of the prisoner's membership in the STG and the prisoner fails to make a credible renunciation of his membership. PD 04.04.113(S). The CFA STG manager makes the final determination on designating a prisoner as an STG member. PD 04.04.113(T). A prisoner may be designated an "STG II" member if: (1) he is an STG I member and is found guilty of major misconduct related to his STG activity, (2) was previously an STG I member, and currently presents a threat to prisoners or staff, or (3) is identified as a leader, enforcer, or recruiter in an STG. PD 04.04.113(W).

A prisoner designated as an STG I member must be housed in security level II or higher. STG I prisoners are also subject to the following restrictions: prisoners are generally limited to three visits per month (the limit does not apply to counsel or clergy); classification to a school or work assignment only as approved by the CFA STG manager; no attendance at group meetings of prisoners, except for approved religious services; cell search at least once a week. PD 04.04.113(BB).[1] A prisoner designated as an STG II member must be housed in security level IV or higher. STG II members are also subject to the following restrictions: prisoners are generally limited to two non-contact visits per month (the limit does not apply to counsel or clergy); classification to a school or work assignment only as approved by the CFA STG manager; no attendance at group meetings of prisoners, except for approved religious services; no participation in group leisure time activities, except for yard; cell search at least once per week; out-of-cell movement not to exceed one hour per day, excluding showers, meals, work, etc. PD 04.04.113(CC).

---

[1] *See also* MDOC Director's Office Memorandum 2020-12 (Eff. 1/1/2020) available at https://www.michigan.gov/documents/corrections/DOM_2020-12_STG_Final_675287_7.pdf.

The STG policy requires local STG coordinators to review each prisoner with an STG designation at least annually to determine whether the designation should be removed or modified.  If the local coordinator believes the designation should be removed or reduced, he or she can make that recommendation to the warden.  If the warden approves, the matter proceeds to the CFA STG Coordinator.  Only that coordinator can decide whether to remove or reduce the designation.

Plaintiff suggests that there are specific requirements for the removal of the designation.  Plaintiff alleges that he has attempted to satisfy those requirements; but, as he moves from facility to facility, MDOC personnel seem to change those requirements, greatly interfering with Plaintiff's prospects for parole.  That problem is the foundation for Plaintiff's complaint.

The events about which Plaintiff complains occurred at ECF, where Plaintiff resides now, but also at MBP and the Bellamy Creek Correctional Facility (IBC).  Plaintiff sues the following MBP personnel: Inspector K. Nemesito, STG Coordinator Unknown Phillips, and Assistant Resident Unit Supervisor (ARUS) R. Horrocks.  Plaintiff also sues IBC STG Coordinator B. Roland.  Finally, Plaintiff sues the following ECF personnel: STG Coordinator M. Dunn, ARUS Unknown Weaver, Grievance Coordinator T. Bassett, Corrections Officer Unknown Tackett, and Warden L. Parrish.

A.    **MBP**

Plaintiff alleges that on September 3, 2017, Defendant Horrocks would not assist Plaintiff with his Parole Eligibility Report.  Plaintiff states that she abused her authority, but he does not explain how.  Plaintiff contends that Horrocks sabotaged Plaintiff's hopes of parole.

Plaintiff alleges that Defendant Phillips did not honor his promise that Plaintiff would be removed from STG status if Plaintiff remained ticket free for 6 months.  According to Plaintiff Defendant Phillips has discriminated against Plaintiff based on his race and religion.

4

Plaintiff alleges that Defendant Nemesito is responsible for the discriminatory practices because he turns a blind eye to what the others are doing and fails to enforce the MDOC's STG policy.

**B.     IBC**

Plaintiff was transferred to IBC on September 27, 2017.  On October 15, 2017, Plaintiff wrote to Defendant Rolland regarding Plaintiff's removal from STG I status.  One month later Plaintiff grieved Rolland because Plaintiff had not been called out for a meeting regarding his STG status.  That day, however, Rolland told Plaintiff that Plaintiff would have to be 6 months ticket free to be removed from STG status.  Plaintiff claims that the requirement is inconsistent with MDOC policy.  Plaintiff claims he lost his parole on January 19, 2018 because he was still on STG I status.

**C.     ECF**

Plaintiff was transferred to ECF on January 24, 2018.  Shortly thereafter, Plaintiff sent a letter to Defendant Dunn noting that Plaintiff had been ticket free for two and one-half years, but with all of the transfers, Plaintiff could not get the required time at any one facility.  Plaintiff also explained that he was housed in security level II, the level required for his STG designation to be removed.  Dunn told Plaintiff that he would have to be one year ticket free at ECF before the STG designation could be removed.  Plaintiff filed a grievance against Dunn.

During May of 2018, Plaintiff had an incident with Defendant Tackett on the yard. Plaintiff asked to go inside halfway through the yard period.  Plaintiff claims that Defendant Tackett was rude, threatening, and used profanity in his response directing Plaintiff to stay on the yard.   Plaintiff claims that Tackett returned later commenting that Plaintiff had previously assaulted staff and noting that he saw Plaintiff on camera shaking the fence.  Tackett informed

Plaintiff that he would receive a misconduct ticket for that and commented on how the ticket would impact Plaintiff's efforts to renounce his STG status.

Plaintiff claims that Defendant Bassett did not properly handle the grievances Plaintiff filed against Defendant Tackett and others.

On July 3, 2018, Plaintiff grieved Defendant Parrish for keeping Plaintiff on STG status.

On November 5, 2018, Plaintiff wrote Defendant Weaver asking for a "point reduction" and reclassification.  Plaintiff states, on information and belief, that Weaver, on December 14, 2018, moved a white inmate to security level II who had less ticket-free time than Plaintiff.  Plaintiff was moved to security level II on December 27.

Throughout 2019, Plaintiff continued to press for resolution of the STG issue, with letters and grievances.  Despite his continuing efforts, the parole board gave Plaintiff a 12-month flop on March 3, 2020.

Plaintiff contends that Defendants, collectively, have violated Plaintiff's First Amendment rights to freedom of religion, speech, and petition by retaliating against Plaintiff for his participation in conduct protected by the First Amendment.

Plaintiff contends that Defendants have violated Plaintiff's Eighth Amendment rights by keeping Plaintiff locked in segregation for extended periods of time without due process. Plaintiff also contends that Defendants have violated his Eighth Amendment rights because of all of the benefits he has lost because of his STG status.

Plaintiff contends that Defendants have violated his Fourteenth Amendment due process rights by keeping Plaintiff on STG status.  Plaintiff contends also that Defendants have

violated his Fourteenth Amendment equal protection rights by discriminating against him because of his race and religion.

Plaintiff seeks a declaration that Defendants have violated his constitutional rights, hundreds of thousands of dollars in compensatory and punitive damages, and injunctive relief compelling Defendants to follow MDOC policy and procedures for PERs and hearings, compelling Defendants to remove STG and related entries from Plaintiff's record, and preventing Defendants from discriminating against Plaintiff.

## II.    Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the

*Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## III.    Eighth Amendment violations

Plaintiff contends that his extended placement in administrative segregation and the restrictions he suffers because of his STG status rise to the level of cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment prohibits punishments that are not only physically barbaric, but also those which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-103(1976). To establish an Eighth Amendment claim, the prisoner must show that he was deprived of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Restrictions that are restrictive or even harsh, but are not cruel and unusual under contemporary standards, are not unconstitutional. *Id.* Thus, federal courts may not intervene to remedy conditions that are merely unpleasant or undesirable.

**A. Segregation**

Placement in segregation[2] is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'"  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. 337, 347 (1981); *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999).  The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation.  *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008).

Moreover, Plaintiff's complaint does not allege that he was placed in administrative segregation during the time at issue in his complaint: 2017 to 2020.  Plaintiff's affidavit, however, tracks back to 1997 and describes extended placements in segregation.  None of those placements occurred during Plaintiff's most recent placements at MBP, IBC, or ECF; therefore, none of those placements were the product of unconstitutional conduct by these Defendants.  Consequently, Plaintiff has failed to state a claim against these Defendants for an Eighth Amendment violation by virtue of Plaintiff's placement in segregation.

---

[2] In the MDOC, security classifications, from least to most secure, are as follows:  Levels I, II, IV, V, and administrative segregation.  MDOC Policy Directive 05.01.130 ¶ B (Oct. 10, 2011).  There are three types of segregation: temporary segregation, administrative segregation, and punitive segregation.  MDOC Policy Directive 04.05.120 ¶¶ M, Q, Z (June 1, 2019).  Administrative segregation is the most restrictive and is imposed for institutional security, *e.g.*, when a prisoner poses a serious escape risk.  *Id.* ¶ Q.  Detention, or "punitive segregation," can be imposed as a sanction for committing a major misconduct, if ordered by the hearing officer.  *Id.* ¶ Z.  If possible, detention is served in a designated detention cell rather than in a cell designated for administrative segregation.  *Id.*  A prisoner may not remain in detention for a period longer than that ordered by the hearing officer, *id.* ¶ Z, but a prisoner classified to administrative segregation remains in that classification until he is reclassified, *id.* ¶ I.  The "behavioral adjustment" of a prisoner in segregation is reviewed periodically by the Security Classification Committee (SCC).  *Id.* ¶ FFF.  Reclassification from administrative segregation occurs only with the approval of the SCC and the Warden (or designee).  *Id.* ¶ KKK.  If the administrative segregation is the result of "an assault on staff resulting in serious physical injury to staff, escape, or attempted escape," the approval of the Warden and the Regional Prison Administrator are required.  *Id.*

B.     **STG restrictions**

Plaintiff also contends that the restrictions he suffers because of his STG status rise to the level of cruel and unusual punishment.  Plaintiff is simply wrong.  The restrictions that apply to an STG I designee are less onerous than those imposed in segregation.  If administrative segregation conditions are not harsh enough to constitute cruel and unusual punishment, STG I restrictions are not harsh enough either.  Plaintiff's allegations do not show that his basic human needs have not been met as an STG designee.  Therefore, it cannot be said that STG restrictions violate the Eighth Amendment.

**IV.     Due process**

The elements of a procedural due process claim are:  (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process.  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  "Without a protected liberty or property interest, there can be no federal procedural due process claim."  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).  Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Plaintiff suggests that due process should protect his prospect of parole, his participation in programs necessary to obtain parole, his security level, and the removal or reconsideration of his STG status.  None of those interests are protected by the due process clause.

As noted above, STG status carries with it a number of restrictive conditions of confinement.  The Supreme Court long has held that the Due Process Clause does not protect every

10

change in the conditions of confinement having an impact on a prisoner.  *See Meachum v. Fano*, 427 U.S. 215, 225 (1976).  In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause.  According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).  The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship.  *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005).

The Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification.  *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976).  Prisoners cannot "have a protected liberty interest in the procedure[s] affecting [their] classification and security, because the resulting restraint, without more, [does] not impose and 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Cash v. Reno*, No. 97-5220 1997 WL 809982, at *1 (6th Cir. Dec. 23, 1997); *see also Morris v. Metrish*, No. 97-1624, 1998 WL 246454, at *2 (6th Cir. May 5, 1998); *Moore v. Sally*, No. 97-4384, 1999 WL 96725, at *1 (6th Cir. Feb. 3, 1999).  Without such a protectible interest, Plaintiff cannot successfully claim he has been denied due process, because "process is not an end in itself." *Olim*, 461 U.S. at 250.

11

The Sixth Circuit has followed the Supreme Court's rulings in a variety of security classification challenges. For example, in *Guile v. Ball*, 521 F. App'x 542 (6th Cir. 2013), the Sixth Circuit rejected Plaintiff Guile's claim that his designation as a homosexual predator and consequent transfer to a Level V facility with more restrictive conditions resulted in an atypical, significant deprivation. 521 F. App'x at 544; *see also O'Quinn v. Brown*, No. 92-2183, 1993 WL 80292, at *1 (6th Cir. Mar. 22, 1993) (designation as homosexual predator and assignment to Level IV facility with additional restrictions did not implicate a protected liberty interest).

Plaintiff's STG designation is, in effect, just another type of security classification. *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005). Nonetheless, because the restrictions are more severe than those that follow from being designated at the highest security level—level V— additional scrutiny of their significance and typicality is appropriate.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court took a closer look at the restrictive conditions of confinement that followed classification to the highest security— "Supermax"—prison in Ohio:

> Conditions at OSP[, the "Supermax" facility,] are more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units. The latter are themselves a highly restrictive form of solitary confinement. *See Austin I, supra*, at 724-725, and n.5 (citing Ohio Admin. Code § 5120-9-13 (2001) (rescinded 2004)). In OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.
>
> Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

> Aside from the severity of the conditions, placement at OSP is for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there is no indication how long he may be incarcerated at OSP once assigned there. *Austin I, supra*, at 740. Inmates otherwise eligible for parole lose their eligibility while incarcerated at OSP. 189 F. Supp. 2d, at 728.

*Wilkinson*, 545 U.S. at 210-11. The Court considered, as *Sandin* directs, whether these conditions were significant and atypical compared to the ordinary incidents of prison life. The Court acknowledged the difficulty in "identifying the baseline from which to measure what is atypical and significant . . . ." *Id*. at 223. Nonetheless, the Court concluded that at least some of the restrictions imposed in Ohio's "Supermax" were atypical and significant "under any plausible baseline." *Id*. The Court declared that the specific restrictions that rendered confinement in "Supermax" atypical and significant were:

> almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin,* placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. *Austin I*, 189 F. Supp. 2d, at 728. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP. *Sandin*, *supra*, at 483.

*Id*. at 223-24.

Two months after the Supreme Court issued the *Wilkinson* opinion, the Sixth Circuit considered whether the restrictions that followed the STG designations (I and II) were significant and atypical under *Sandin*. *Harbin-Bey*, 420 F.3d at 576-77. The court held that they were not atypical and significant and that, therefore, the plaintiff did not have a liberty interest protected by the Fourteenth Amendment Due Process Clause and Plaintiff's complaint was properly dismissed upon initial review. *Id*.

Four years later, in *Heard v. Caruso*, 351 F. App'x 1 (6th Cir. 2009) (unpublished), the Sixth Circuit again considered the restrictions that followed the STG II designation. In *Heard*, however, the plaintiff had supplemented his complaint to include allegations that parroted some of the language *Wilkinson* Court used to describe Ohio's "Supermax" restrictions.[3] The court of appeals concluded those allegations warranted factual inquiry along the lines of that conducted by the Supreme Court in *Wilkinson*.

On remand, this Court granted summary judgment in the *Heard* defendants' favor on Heard's due process claim. *Heard v. Caruso*, No. 2:05-cv-231 (W.D. Mich. Aug. 30, 2011) (ECF No. 410). The Court found that the restrictions attendant to the STG II designation did not rise to the level of the "Supermax" restrictions that the *Wilkinson* Court found warranted due process protections. Specifically, this Court found that the STG II restrictions did not extremely isolate the prisoners or disqualify them from parole. This Court concluded, therefore, that due process protection for the STG II designation was not required. (2:05-cv-231, ECF No. 410 PageID.2470.)[4]

---

[3] Prisoner Heard's supplemental allegations were as follows:

> Security Threat Group designations to status II result in plaintiff being placed in a maximum security prison, which is the most secured of all Michigan Department of Corrections prisons; but plaintiff does not challenge the increase in classification as a result of the STG designation. The challenge is to the atypical and significant hardships place[d] on plaintiff as a result of the designation that trigger due process. The designations are indefinite and paroles are automatically denied, there are only five minute showers (which include washing and drying off); visits are restricted to two one hour non-contacts visits per month; and all human contact is limited to yard, dining hall, library and religious service which culminate to a potential maximum of 21 hours out [of] the cell per week. Cell to cell communication is prohibited, the lights, though [they] may be dimmed at night, [are] on 24 hours a day. These conditions are not ordinary conditions in the life of a prisoner in lower levels (1-4) in MDOC.

*Heard*, 351 F. App'x at 8-9. Heard also suggested that the designation disqualified him from parole. *Id*. Plaintiff Clark's allegations reproduce Prisoner Heard's supplemental allegations, almost word-for-word. (Compl., ECF No. 1, PageID.28.) Plaintiff has softened Heard's allegations a little bit: where Heard suggested the STG II designation disqualified a prisoner from parole, Plaintiff Clark states that "[p]aroles are almost automatically denied." (*Id*.)

[4] The Sixth Circuit Court of Appeals affirmed this Court's summary judgment on that claim. *Heard v. Caruso*, No. 12-1517 (6th Cir. Mar. 12, 2013) (*Heard II*). The court of appeals did not consider whether Plaintiff had a liberty

14

Two of the key factors that prompted the *Wilkinson* Court to conclude that due process protected the "Supermax" classification—parole disqualification and extreme isolation—are not present here. Without those factors, the conditions of confinement for prisoners designated STG II are not significant and atypical departures from the normal incidents of prison life. Plaintiff has failed to identify a protected liberty interest with respect to his security level or STG classification and, consequently, he has failed to state a claim for violation of his due process rights by virtue of their actions with respect to Plaintiff's security level or STG designation.

Similarly, Plaintiff does not have a constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs based on the Fourteenth Amendment. *See, e.g., Moody*, 429 U.S. at 88 n.9 (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952-54 (6th Cir. 1989) (no constitutional right to rehabilitation); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services). Because Plaintiff has no liberty interest in the programs that might be steps on the path to parole, he fails to state a due process claim regarding denial of or delays in participation in such programs.

---

interest; instead, the court reasoned that even if he did have such an interest, he received all of the process he was due. *Heard II*, at p. 6 (No. 2:05-cv-231, ECF No. 442.)

Finally, Plaintiff fails to raise a claim of constitutional magnitude because he has no liberty interest in being released on parole. There is no constitutional or inherent right to be conditionally released before the expiration of a prison sentence. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Although a state may establish a parole system, it has no duty to do so; thus, the presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release. *Id.* at 7, 11; *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). Rather, a liberty interest is present only if state law entitles an inmate to release on parole. *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991).

In *Sweeton v. Brown*, 27 F.3d 1162, 1164-65 (6th Cir. 1994) (en banc), the Sixth Circuit, noting "the broad powers of the Michigan authorities to deny parole," held that the Michigan system does not create a liberty interest in parole. The Sixth Circuit reiterated the continuing validity of *Sweeton* in *Crump v. Lafler*, 657 F.3d 393, 404 (6th Cir. 2011). In *Crump*, the court held that the adoption of specific parole guidelines since *Sweeton* does not lead to the conclusion that parole release is mandated upon reaching a high probability of parole. *See id.*; *see also Carnes v. Engler*, 76 F. App'x 79, 80 (6th Cir. 2003). In addition, the Sixth Circuit has rejected the argument that the Due Process Clause is implicated when changes to parole procedures and practices have resulted in incarcerations that exceed the subjective expectation of the sentencing judge. *See Foster v. Booker*, 595 F.3d 353, 369 (6th Cir. 2010). Finally, the Michigan Supreme Court has recognized that there exists no liberty interest in parole under the Michigan system. *Glover v. Mich. Parole Bd.*, 596 N.W.2d 598, 603-04 (Mich. 1999).

Until Plaintiff has served all four of his maximum sentences, totaling 34 years, he has no reasonable expectation of liberty. The discretionary parole system in Michigan holds out

"no more than a mere hope that the benefit will be obtained." *Greenholtz*, 442 U.S. at 11. The failure or refusal to consider Plaintiff for parole, therefore, implicates no federal right. In the absence of any liberty interest, Plaintiff fails to state a claim for a violation of his procedural due process rights against any of these Defendants.

## V.    Equal protection

Plaintiff alleges "Plaintiff has been discriminated against because of his race and his religion, (Muslim) as stated in paragraphs 16, 22, 23, 41, 42, and 66." (Compl., ECF No. 1-1, PageID.16.) In Paragraph 16, Plaintiff states: "Plaintiff claims he is being discriminated (14th Amendment rights violation) against because of race and religion, (Muslim)." (*Id.*, PageID.11.) In paragraph 22, Plaintiff states "Also plaintiff claims discrimination (14th Amendment rights violation) . . . ." (*Id.*, PageID.12.) In Paragraph 23, Plaintiff states the words "Equal Protection" violation" and "14th Amendment," but he does not explain why Defendant Rolland's requirement that Plaintiff be ticket-free for six months is a violation. (*Id.*)

In paragraphs 41 and 42, Plaintiff notes that Defendant Weaver moved a white inmate to security level II sooner than he moved Plaintiff to security level II (13 days sooner), even though the white inmate had less "ticket-free" time than Plaintiff. (*Id.*, PageID.14.) Finally, in paragraph 66, Plaintiff states that non-defendant corrections officer Bilas and a non-defendant unknown corrections officer refused to take Plaintiff to a security classification committee meeting on March 12, 2020, because it was "feeding time." (*Id.*, PageID.15-16.)

The Equal Protection Clause prohibits discrimination by government actors which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). The threshold element of an equal protection claim is disparate treatment.

17

*Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'").

Plaintiff's allegations are hopelessly conclusory. Moreover, with one exception, although Plaintiff complains that he was treated badly, he does not claim that he was treated differently than any other prisoner. The only exception is Plaintiff's claim that Weaver moved a white prisoner to security level II before he moved Plaintiff. Accordingly, with regard to all claims except the security level claim against Defendant Weaver, Plaintiff has failed to state a viable equal protection claim.

With regard to the claim against Weaver, simply alleging disparate treatment, is not enough. An "equal protection" plaintiff must be similarly situated to his comparators "in all relevant respects . . . ." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011); *see also Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) ("'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'"); *Tree of Life Christian Schools v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'"). Plaintiff fails to allege that the unnamed white prisoner was similarly situated in all relevant respects. *Umani v. Mich. Dep't of Corr.,* 432 F. App'x 453, 460 (6th Cir. 2011) (To be a similarly-situated person, "the comparative [prisoner] 'must have dealt with the same [decisionmaker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would

18

distinguish their conduct or [the defendant's] treatment of them for it.'") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)); *Project Reflect, Inc. v. Metropolitan Nashville Bd. of Public Educ.*, 947 F. Supp. 2d 868, 881 (M.D. Tenn. 2013) ("'Plaintiffs . . . fail to plead the existence of a similarly situated comparator . . . [therefore,] the Complaint does not contain sufficient factual matter to state a plausible claim."). Plaintiff says only that he and the other prisoner were similar with respect to "ticket-free" time—although Plaintiff's record was better in that regard—but different with regard to race. But "ticket-free" time hardly defines the outer bounds of "all relevant respects" with regard to the security classification decision. See MDOC Policy Directive 05.01.130, Prisoner Security Classification (eff. Oct. 10, 2011). Because Plaintiff's allegations of a similarly situated comparator fall short, he has failed to state a claim against Defendant Weaver for violation of his equal protection rights.

## VI.     First Amendment retaliation

Finally, Plaintiff contends that each Defendant retaliated against him for exercising his First Amendment right to file grievances or write letters seeking relief from his STG problem. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

19

Plaintiff's grievances and letters of complaint are certainly protected conduct. *Smith*, 250 F. 3d at 1037.  And, if Plaintiff's allegations are true, the Defendants' interfering with the removal of Plaintiff's STG designation or his prospects for parole might certainly deter a person of ordinary firmness from exercising his First Amendment right to petition for redress.  But, Plaintiff's allegations fall short with respect to the third element.

With one exception, Plaintiff does not allege that any of the Defendants stated a motivation for the actions Plaintiff characterizes as adverse.  The only exception is Defendant Tackett who suggested to Plaintiff that the writing of the misconduct against Plaintiff may have been motivated by Plaintiff's prior assault of prison staff.  The assault of prison staff—the crime for which Plaintiff is presently serving time—is not protected conduct.  Indeed, it is a violation of prison regulations and state law.  "'[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct' and cannot proceed beyond step one' of the three-step retaliation analysis." *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (quoting *Thaddeus-X*, 175 F.3d at 394).  Therefore, to the extent Plaintiff relies on the Defendants' stated motivations to satisfy the third element of a retaliation claim, he has failed to state such a claim.

Plaintiff instead asks the Court to infer that Defendants' adverse actions were motivated by his protected conduct based, apparently, on the timing of the events.  Temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)).  However, "[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004).

The problem with relying on temporal proximity in Plaintiff's case is that too often the adverse action precedes Plaintiff's protected conduct.  For example, Defendant Horrocks would not assist Plaintiff with his Parole Eligibility Report—the adverse action—so he grieved her—the protected conduct.  There is no indication that Plaintiff grieved Defendant Phillips before Phillips failed to honor the six-month ticket-free promise.  Instead Plaintiff grieved Phillips after he had transferred to IBC.  Plaintiff grieved Defendant Rolland after Rolland took the adverse action of failing to call Plaintiff out for a meeting regarding Plaintiff's STG status.  Plaintiff grieved Defendant Dunn after Dunn took the adverse action of telling Plaintiff he would have to be ticket-free for a year at ECF.

As Plaintiff's allegations and the attachments to Plaintiff's complaint make clear, Plaintiff is a prolific writer of letters of complaint and filer of grievances.  It would be difficult to find an "adverse action" that is not temporally proximate to a letter or grievance.  Nonetheless, in almost every instance, the adverse action of which Plaintiff complains precedes the protected conduct.  Under these circumstances, the facts alleged by Plaintiff do not support the inference that the adverse actions of which he complains were motivated by retaliatory animus for protected conduct.  Accordingly, Plaintiff has failed to state a claim for First Amendment retaliation.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  The Court does not certify that an appeal would not be in good faith.

Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:   June 8, 2020                              /s/ Janet T. Neff
                                                   Janet T. Neff
                                                   United States District Judge